Good morning, everyone. The first argued case this morning is Schaeffler Group USA against the United States. Mr. Schaeffler. Good morning, Your Honors. May it please the Court. The issue presented for consideration this morning is whether the petition support provision of the CDSOA is impermissibly retroactive under the Fifth Amendment due process clause within the context of the anti-friction bearings, anti-dumping orders. On the threshold question of retroactivity, you spent a lot of time in your brief on Princess Cruz's and the Landgraf analysis, but doesn't that only apply when there's some ambiguity about whether it's retroactive? I mean it's clearly retroactive on its face, correct? It is, Your Honor. It is. You're referring to Landgraf and Progeny. Yes. I mean, why are we even going down that? Yes, I agree, but those cases did not involve a constitutional challenge. I understand that, but you go into that analysis for purposes of assessing retroactivity, but I don't think there's any debate that it's retroactive, is there? I do, Your Honor. I still think it's relevant. Those cases and the principles that they discuss regarding retroactivity still have applicability. I do agree that there's a difference. You believe that it's unambiguously retroactive on its face, right? Yes. And I don't think your opponents really disagree with that, do they? They do not. Okay. All right. So let's discuss whether it's okay to be retroactive. Whether it's impermissibly retroactive. So the underlying anti-dumping orders here, and I think this is important as you will see, were promulgated in May of 1989. The petition was filed in March of 1988. The ITC conducted its final injury determination in March of 1989, and anti-dumping duty orders were imposed in May of 1989 on three classes of kinds of merchandise. As an aside, there were three other classes of kinds of merchandise as to which the ITC decided there was no injury. The CIT decision below dismissed Scheffler's claims for failure to state based upon its previous New Hampshire ball bearings decision. And upon SKF. Yes, Your Honor. New Hampshire ball bearings relied on your SKF decision. And in your SKF decision, upon which New Hampshire ball bearings was based, you articulated, this court articulated, the purposes of the statute. And the purposes were actually twofold. Number one, to reward injured parties who assisted government enforcement of the anti-dumping laws by initiating or supporting anti-dumping proceedings. And number two, to compensate producers injured by dumping. It also held that retroactive application, quote, directly advances the government's substantial interest in trade law enforcement. It did, Your Honor. It did. So SKF said there was a rational basis for retroactivity. Are you saying that because that analysis was done under the Equal Protection Clause of the First Amendment that that same rational basis can't justify, can't be justified under the Due Process Clause? I'm saying that, Your Honor, as it relates to this particular order, yes, I am saying that. I'm saying that the retroactive aspect has to be viewed in the context of the order as to which Scheffler has applied for reimbursement. You're not saying that you could make the same constitutional challenges that were made in SKF? I cannot. And you believe a different constitution? I cannot, and you would not hear it. All right. But in this case, Your Honor, the intervener, Timken, did move for summary disposition of this case based upon your decision in SKF. You denied that motion. Clearly, because, I think, because this raises a different constitutional challenge, albeit under the Fifth Amendment, as was equal protection in the SKF case. So I think this is different. And yes, there is a retroactive aspect, and yes, my opponents do agree, because the retroactive aspect attaches new legal consequences to past actions. So it is retroactive. The question then becomes, is it impermissibly retroactive? All right. So for the due process clause, what do you need? Do you need a protected property interest? Yes. And what is your protected property interest here? I mean, you don't have a protected property interest in the law. We haven't. Yes, Your Honor. I understand my opponent's argument regarding protected property interest. I'm trying to understand yours. My position would be that Scheffler's applications for bird money, and its right to bird money, still up in the air here, is a sufficient property interest to enable it to proceed under this basis. A prospect of retroactive right? Yes. Yes, Your Honor. That's my position. To the same extent as any other applicant. What is at stake here, roughly? What is the amount that you believe would be shared on your position? Your Honor, we've indicated in our brief that, and it's a matter of public record, that the Timken companies, including Timken and Torrington and MPB, have collected almost three quarters of a billion dollars under this statute. Much of it in the early years, but some of it in the later years as well. It would depend upon the extent to which our client's qualifying expenditures, related to the qualifying expenditures of all companies, that applied under the same dumping orders. Clearly, you don't satisfy the text of the statute, right? We do not. All right. So is your protected property interest in making sure that your competitors, who do satisfy the text of the statute, don't get money? No, Your Honor, because we have applied, we have been rejected, that's why we're in court, and my position is, we have a property interest to protect in those funds. Okay. I'm struggling to understand what your property interest is. If Timken has a property interest in acquiring bird money reimbursement, and I would suggest that it absolutely does. Well, they have an interest in it, of course. Everybody has an interest in getting money. It's a property interest. Now, in my client's case, it's a prospective property interest, and perhaps it's an inchoate property interest, but it's nevertheless a property interest, cognizable under the Fifth Amendment due process clause. So we have, I hope I've answered your question, Your Honor. Well enough, yes. So I don't know exactly how much we're talking about, but it is a substantial sum over the course of multiple years. Impermissibly retroactive. Well, we have rational purposes. SKF decided that the purpose of the Bird Amendment was rational. Our position is, yes, you have rational purposes, but those rational purposes are not furthered by rational means. That was also articulated in the SKF case. Rational purpose furthered by rational means. The position is that the petition support provision, as applied in this case, is not rational for the following reasons. The answers to why it's not are temporal, related to time, timing, relating to these qualifying expenditures, and relating to the question of injury. The period of investigation under these anti-dumping orders was 1985 to September of 1988, when injury was found. The anti-dumping orders, as I mentioned earlier, were promulgated May 15, 1989. The CDSOA was enacted 11 to 12 years later, and provided for the reward and compensation of injured domestic producers who supported the petition or initiated the petition. The qualifying expenditures, also in the statute, which form the basis of the award, are those incurred after May 15, 1989. That is to say, after the date the dumping orders went into effect. Given reasonable temporal proximity between the date of the AD orders and the implementation of the CDSOA, the reasonable conclusion is that these qualifying expenditures bear some reasonable relation to the injury that was suffered. These qualifying expenditures were incurred 11 to 12 years before, and over that entire period. These, we say, are too remotely connected to the injury and bear no reasonable relation to it. Timpton-Tarrington and its affiliate, MPB, had qualified expenses of over $2 billion over that period, which explains why and how they received the lion's share of the money. I am still totally at a loss. So your claim is that the violation of due process to you, to your client, to have Timpton and the other claimants qualify under the statute for payment. They qualify. The question is, is the petition support provision, which disqualifies my client, unconstitutional because it is impermissibly... Nobody was qualified before the statute was passed, right? Correct. So it is not like there was this right that existed, everybody was anticipating this money, and then the statute was passed and said, oh, now we're only going to give it to X. When the statute was put in place for distribution, the limitations were in the original statute, right? They were. Okay. So where is your vested right? Again, Your Honor, I apologize for having to repeat myself. Can I try? Thank you, Judge McCulloch. Isn't it what you're saying that because your client was put in an adverse position in its competitive ability against Timpton and Torrington, it impacted your rights? It did, yes. Is that your argument? That's one of our arguments, and it appears in our brief. But I happen to think the better argument is that we have a right, in these funds, until you say we don't. And the reason it's a better argument is because being put at a competitive disadvantage is not a constitutionally protected property interest, right? I guess that's right. Right. So that's why I understood what I thought was your argument, and then you backed away from it here today. So now I'm trying to understand what is your counterargument. Okay. Let's hear from the other side, and we'll save you rebuttal time. Thank you, Your Honor. Okay, so let's see. Mr. Are you Mr. Gallagher? I'm not, Your Honor. I wish I was. I'm Mr. Tomlinson. Mr. Tomlinson. For the United States. Good morning, Your Honor. Martin Tomlinson for the United States. You wish you were because you make more money than government employees? Look at him. You think that's funny. Well-spoken. Good for you. Your Honor, I'd like to pick up directly with something Mr. Schutzman was discussing there, which was this issue of what the appellant's property interest is in this case. And he specifically articulated that his primary argument, as I understand it, was that in this case, Scheffler's property interest is that they filed an application. They filed an application to be in ADP and receive CDSOA distributions. And that is simply not enough. That is not a constitutionally protected property interest. Under the law, the Supreme Court in the Town of Castle Rock case, if I can find it here, the Supreme Court in the 2005 Town of Castle Rock case specifically says to have a property interest in a benefit, a person must have more than an abstract need or desire and more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it. But that's the constitutional question. Isn't it essentially by analogy to ex post facto laws and a lot of other things which affect a right retroactively that you didn't have until later? The basic issues of fairness, I think, are being raised here rather than resolving it on, let's say, the technicality of a property interest. There is a fundamental imbalance, is there not, in the way this is worked out in practice? Your Honor, there's an imbalance insofar as the entities, the affected domestic producers who did provide assistance to the ITC in its investigation have been rewarded in accordance with the statute. And those domestic producers, like Schaeffler, that opposed the anti-dumping duty investigation. You mean checking a box or not checking a box, let's be clear. Assistance, there was no requirement of assistance. There was a requirement that you check the support box. Well, Your Honor, I... You could provide assistance, but you didn't have to. There's the actual checking the box and there's providing the other information on the questionnaire. That's the assistance, and that's consistent with what this Court has held in SKF and Ashley Furniture. Supposing SKF was wrongly decided as far as retroactivity? That would impact things, wouldn't it? I'm not sure I quite understand the... SKF says that retroactive application directly advances the government's substantial interest in trade law enforcement. If that was wrong, then we'd be on an entirely new playing field wouldn't we? Possibly, yes. But that is the decision of this Court. Unless we take it in bank, yes. That's correct. But, Your Honor, this Court... It is important to note that this Court in SKF did articulate what the legitimate purpose of the CDSOA was and then upheld the constitutionality of the law under that purpose. And it's important to note, of course, that SKF also had a First Amendment challenge which was analyzed under intermediate scrutiny, which is a much more exacting test than the rational purpose test that it applied to the equal protection claim in that case and that this Court should apply to the due process claim that's at issue in this case. We understand the playing field we're on. We have SKF. This Court refused to take it on bank. The Supreme Court denied cert. So SKF, at least for now, is what the law is. Does it matter that this is a due process challenge as opposed to an equal protection or First Amendment challenge? Well, the test is different for a due process challenge than a First Amendment challenge. First Amendment involves intermediate scrutiny. The test that this Court should apply to a due process challenge is the same as it applied to the equal protection challenge in SKF, which is, is the retroactive application of this statute rationally related to a legitimate governmental purpose. Okay, so that's my question. Could there be a different purpose analysis that is needed under a due process cause challenge than would be needed under an equal protection cause challenge? If we're talking about retroactivity, the only novel issue in this case that's different from SKF is, is there a rational purpose to the specific retroactive, specifically looking back to the assistance or non-assistance provided, provided by the chaffer in 1988? SKF was the argument made that it's not just a question of whether the statute on its face, for instance, for purposes of relief would provide a differentiation between those who check the box and do whatever SKF says you have to do and those who don't, but that in this particular case, because there's such a huge period of retroactivity and the expenditures were so large during that period, that the analysis should be different. I think that's the argument that your friend on the other side is making. Not that I'm aware of, Your Honor. I'm not aware of any authority that says that the dollar amount comes into whether or not this is rationally related to a legitimate governmental purpose test. In terms of the actual year of scope of the retroactivity, I think it's really important to note that what was before this court in SKF are the same orders that we're talking about here. It's the anti-friction bearing orders. SKF, in that case, like Schaeffler in this case, sent in its questionnaire, provided its opposition in 1988, just like Schaeffler did. Factually, it's pretty much on all fours with this. In that case, when this court articulated what the purpose of this statute is, it specifically said the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted, in the past test, government enforcement of the anti-dumping laws. The facts of that case are almost identical to this case in that SKF opposed the anti-dumping duty investigation in 1988. This court was hearing facts about the same scope of time that we have here and the exact same duty orders. This was a legitimate governmental purpose. It was constitutional. We don't know whether there was just an omission to check a box or active opposition, but nobody has said that there was any active opposition. There is something certainly troubling about passing a law years later where, as they said, had they known that checking a box could have important financial benefits to them, they might have checked the box? Well, they do claim that, Your Honor. Obviously, there's no way for them to demonstrate that. We don't know what they actually would have done. Well, does it make any difference? Would it make any difference? It doesn't make any difference to your question, Your Honor. I believe that this court decided in SKF pretty clearly what support means and what oppose means in the context of this statute. If it didn't, I think this court reiterated it strongly in the Ashley Furniture case and specifically drew a bright line that companies like Schaeffler that specifically check that box that they oppose are not petition supporters under the meaning of the statute. The statute is clear. I don't recall that there was a particular constitutional argument made to us in the past, but it's troubling, is it not? No, Your Honor. It's no different from an ex post facto law? Is it? I see I'm out of time. If I can answer the question. Please help me with that. This is where I have a problem. Sure, it's different than an ex post facto law because we're not looking at so many of the cases in this area and the cases Schaeffler cites, especially some of the coal benefits cases. What you're actually talking about there is Congress coming in and passing a law that says based on what happened years ago, we're going to come in and impose an obligation on you and take something from you. You're going to have to pay money into this fund. There, specifically, it is an exaction upon these people. Even in those cases, generally, we're upheld. What we're talking about here, there's been no punishment, no retribution. When Schaeffler turned in its questionnaire and opposed this anti-dumping duty investigation, it had absolutely no expectation that it was ever going to receive any CPSOA distribution. Of course, the statute didn't exist, so they had no expectation. That's correct, Your Honor. To the extent this has upset their expectations, it's only insofar as they did not receive a reward that Congress specifically decided should be reserved for those who were either petitioners or supporters of the petition. They haven't lost anything. Nothing has been taken from them. It's just simply the reward construction of this statute that this court adopted in SKF. A reward has been given to entities like the intervener. We would agree that they've been deprived of a level playing field. We would agree that it has affected the playing field. But, again, there's nothing to indicate that anything has happened here that wasn't specifically intended by Congress that studied this issue and specifically passed this law  Again, I don't think there's anything to indicate I think the law is clear that they have to have a property interest. They have to have a specific entitlement or expectation to something which they have not demonstrated here. Okay. Let's hear from your colleagues. Are you Mr. Stewart or Mr. Gallagher? Mr. Gallagher. I can assure you, Your Honor, I really don't think I make more than Mr. Thomas. I work for the government, too. I'm here on behalf of the International Trade Commission. Based on Judge O'Malley's I think he was complimenting you, Your Honor. Can I ask a threshold question? Oddly, to me, your brief argues that there is no retroactivity. Yeah, I knew this was coming. You didn't really mean that, right? Our argument is that it is not retroactive legislation because it doesn't impose anything on Sheffield. It doesn't require them to do anything. It's not a fine. It's not a tax. There's a difference between ex post facto and retroactive. Ex post facto means you retroactively impose a penalty, a fine, a criminal sanction. Retroactive just means that it does apply to periods of time that relate back. On its face, it relates back, right? It relates back, but there's no effect from the relating back. Isn't that why we're here? Because you relate back for purposes of money that you get. But the money is related to, it's a reward. So you're saying it's a future payment for past activity? Yes, sir. The Congress could justify that easily. Anyone who doesn't qualify is excluded. But they didn't tell him. Nobody knew until later that there was this difference. What the reward is for is for assisting the government in the enforcement of policy, trade policy. I'm not buying your lack of retroactivity, so let's move to the next argument. I was so ready for that one and I figured we would be doing my whole time on that. I'm sorry, I'm drawing a blank. Okay, so assuming it's retroactive. Assuming it's retro, there's a rational basis for it. I'm sorry, thank you. Congress intended to reward parties for assisting in enforcing the trade laws. Going back to orders that predate the enactment, it makes perfect sense because that's the purpose of it. Whether you assisted the government in an investigation that resulted in an order and you did that activity before enactment or post-enactment, it's still the same thing. You're still assisting the government in the enforcement of the trade laws. How does it really help the government? Without industry support for a petition and during the investigation, Your Honor, you wouldn't know whether there was dumping or counterfeiting. Well, you can't do it under the statute unless you have sufficient industry support. Correct. And you can't make your analyses without industry participation. So without the industry... But the industry often participates and still opposes or doesn't support. So the participation alone isn't the end of the inquiry. There's got to be something more that the industry is giving you for purposes of your findings. Well, as Judge Wallach was saying, the investigation isn't going to go forward without sufficient industry support. The industry are the ones who bring the petition. You have to have sufficient industry support in order to conduct the investigation. You need the industry to supply you with the information. And it is true that parties will support or oppose for many reasons, some of which may be related to CDOSA, some of which may not. And that came up in SKF. They could oppose it simply on philosophical reasons. Absolutely. And we've seen that before. The Dumb Countervail Law, the travesty, things like that. Where those parties may have been injured anyway. Perhaps greatly. I see my time has run. Thank you. Okay. Thank you. This is Mr. Stewart. This is Mr. Stewart. I'm pleased to be here this morning. Thank you. I just want to address a couple of questions. Mr. Stewart, I'd like you to answer a question for me. Sure. Because you were there at the get-go and know the ledge history. Who were our initial sponsors in the House and the Senate? In the House, it was Congressman Regula. And in the Senate, I believe it was Senator DeWine. Both from Ohio. Is that coincidental? No. But when the legislation was passed in 2000, there were, I think, 65 co-sponsors in the House and a dozen or more co-sponsors in the Senate that had been looked at for five or six years in terms of the issue. To address your issue, Judge Newman, in terms of whether there's unfairness in terms of going back, certainly the answer can be not in terms of changing a statutory where there is no statutory entitlement. The Supreme Court cases have been very clear on that. If you don't have an entitlement, you have property interest. You don't have an entitlement to keep the law the way it is. And the fact that the law changes by itself is not an issue that is constitutionally worthy of review. Second, Judge Wallach, you indicated that there was a distortion of the level playing field. Actually, that's the exact way it's intended to try to do in the reward system. Both intent and actual. Because if you look at the way the law works, this court in SKF talked about rewarding people who supported the government interest in enforcement of the trade laws. But money is only distributed, A, if an order is issued. So here there's an order issued. And second, if there is a continuation of the unfair trade practice. Now, the reason that that's relevant is that the way dumping is calculated in these particular cases, the varying cases, the vast majority of the cases are through related party importers, such as the Schaeffer companies, FAG and ENIP. And where dumping continues, it is because prices in the marketplace have not been allowed to return to the fair value. So what you were talking about, and if you look at the findings of Congress in that legislation, you will see that there was a concern that prices might not have been restored. But if you have not a group of large producers, but if you have a group of small producers, like the crayfish people who were in Shea Sydney, you've got folks who may have just not been able to read the instructions or ignore them. And among those small producers may well skew the field, because they're all domestics with no international interest. I would not talk about a case that's not before you, but in this case... I'm giving you this as a hypothetical. You could have cases where there would be people who didn't know about the case, or who didn't participate in one way or another, who might find that they are unhappy about the outcome. But that's no different than antitrust litigation, where people, if they don't sign up for a case, don't get the benefits of the case, etc. So the other issue that was raised was whether there was active opposition. In our brief, we review the active opposition. It is truly the case that for our friends at Schaefer, they were in the exact same position as SKF. Active opposition, not simply questionnaire, but active opposition at the Commerce Department, active opposition at the ITC, because in fact, their parent companies were named in the petition, there were large dumping margins that were found on many products. So they had an economic interest, why they wished to oppose, but they were in the exact same position as SKF, so it's not... Was SKF an as-applied challenge or a facial challenge? It was both. SKF was. It doesn't actually say that in the opinion, though, does it? I believe that they both dismissed the facial, and then on the as-applied. But it certainly was argued as both, as I recall. We were amicus or intervenors in the case. Under this burden, did any other industry get the kind of payouts that this industry did? Sure. The information that's been provided is a snapshot at the very beginning of the first few years. If you take a look at later years, there are many industries that have relatively large distributions if there have been large continued dumping in terms of the imports that are there. One of the industries that had pushed hard for the law originally was the steel sector. There are literally hundreds of steel orders that are in place. Steel, foreign producers tend to stop shipping, so there doesn't tend to be continued dumping in those situations. Their problem is that they have to go after repeat cases that they do. But the furniture cases, which were up in Ashley, there were large amounts of money that were involved because there was large amounts of dumping that continued after the order. Our clients, I can tell you, would have been much happier and would have had much greater economic returns had the dumping ceased and not continued. The reason there are large distributions is that there have been massive amounts of dumping that went on for years and years, including past 2000, that became subject to the distributions. But that is the only reason that there's large amounts because people received large dumping and the domestic industry, people brought the cases, petitioners like Timkin, like Torrent, like MPB, were denied relief for years. Thank you very much. Mr. Shetson, you have your full rebuttal time. Thank you, Your Honors. Just a word about Mr. Stewart's last comment about massive amounts of dumping occurring in years subsequent to the passage of the CDSOA. I too, Judge Wallach was there from the get-go, so I have some familiarity with this order and what has transpired. The dumping margins of the major players in these cases in Germany, in Japan, in Italy and France were very, very low as the order matured. Initially, yes, when this case was first brought, there were massive dumping margins. But as time went on, these companies adjusted to that and there really wasn't massive amounts of dumping. You can check it. It's a matter of public record. You can look at the rates in the Federal Register. They were single digits. These are massive companies and although we installed programs to control dumping, we always had some maverick salesman making some crazy sale and creating a problem. But overall, the margins were very low and, of course, this situation predated the absence of zeroing. In the absence of zeroing, there were no margins  in the latter years of these orders, all of which, by the way, now are repealed. Just to conclude, Judge O'Malley, our interest, the client's interest, Scheffler's interest in due process was, as I mentioned, but also that the government would not create an anti-competitive market situation. Without proper notice, without ability to comment, this was in effect a midnight amendment to an ad bill. Nobody knew about it. That was an interest that the company had and, of course, an interest that the company continues to have and Judge Wallach was quite correct that what this did is it created a very uneven playing field. But if your argument is that they shouldn't have even passed the statute, wouldn't that be a facial challenge and yet you told us before this is an as-applied challenge? Yes, because retroactivity is, in this particular case, as-applied. It's not just facial. I don't think I can argue facial because of your SKF decision. I would like to, but I don't think I can. But isn't competitive disadvantage more an equal protection issue than a due process issue? I think not. It is an equal protection issue and, of course, you've already addressed that in SKF, but it's also a due process issue in terms of the retroactive application of the statute. And I do tell you, although I'm sure it doesn't matter and it won't matter for your determination, but had I known, representing this company in 1988 and 1989, where this was headed, things would have been very different. I thank you. You would have stopped the law or you would have checked the box? Well, had I known about it, certainly we might have mounted some opposition. This statute created problems on the Hill from the very beginning after it was enacted, as Your Honors know. Thank you. The case is taken under submission. Thank you all.